# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs June 5, 2002

## STATE OF TENNESSEE v. JOHNNY OWENS and SARAH OWENS

**Appeal from the Circuit Court for Haywood County**
**No. 4436A & B     Terry Lafferty, Judge**

---

**No. W2001-01397-CCA-R3-CD  - Filed November 8, 2002**

---

The defendants, Johnny Owens and Sarah Owens, who are husband and wife, were convicted of aggravated child abuse by a Haywood County Circuit Court jury. Johnny Owens was convicted on one count only, and Sarah Owens was convicted on five counts. Because Johnny Owens' motion for a new trial raised only issues of the sufficiency of the evidence, we review only that issue in his appeal. Sarah Owens raises evidentiary issues and claims that the trial court erred in failing to instruct the jury on the "missing witness" rule, in conditioning the defendants' release from custody during trial upon Ms. Owens' withdrawal of her motion to sequester the jury, and in imposing an excessive sentence. We affirm all convictions and sentences; however, we order Sarah Owens' sentences to be served concurrently.

**Tenn. R. App. P. 3; Judgment of the Circuit Court is Affirmed as Modified.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON and JERRY L. SMITH, JJ., joined.

Ramsdale O'DeNeal, Jr. (for Johnny Owens), Jackson, Tennessee; and Marcus M. Reaves (for Sarah Owens), Jackson, Tennessee, for the Appellants.

Paul G. Summers, Attorney General & Reporter; Elizabeth B. Marney, Assistant Attorney General; Garry G. Brown, District Attorney General; and Clayburn L. Peeples, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

On December 6, 1999, a kindergarten teacher at the Anderson Early Childhood Center (AECC) in Brownsville noticed that one of her students, K.J., showed signs of having a sore back. The teacher testified at trial that, upon examining K.J., she discovered a number of "long, thin marks" on K.J.'s back, some of which had bled and had resulted in scabs. The assistant principal at AECC testified that some of the marks were recent.

The next day, December 7, 1999, after receiving a call from AECC, Renae Pullen, a representative of the Tennessee Department of Children's Services, went to AECC to investigate the suspected child abuse. She observed the "linear injuries" on K.J.'s back and called the Browsville Police Department. Ms. Pullen learned that K.J. was a foster child who, along with five other foster children, resided in the defendants' home. There were two brothers, L.B.-1 and L.B.-2, and three siblings of K.J., J.J., M.J., and S.J. S.J. had been adopted by the defendants.

After a police officer requested that the defendant Sarah Owens go to AECC, Ms. Owens arrived at about 11:00 a.m. on December 7. Ms. Pullen testified that Ms. Owens said she was unaware of the injuries to K.J. and had no explanation for the injuries. Ms. Owens told Ms. Pullen that the children were never in the care of anyone other than herself, the defendant Johnny Owens, or Ms. Owens' mother. Ms. Pullen testified that Ms. Owens was very calm. "There was really no expression," and Ms. Owens did not react when Ms. Pullen informed her that Ms. Pullen was going to take K.J. to the hospital.

After Ms. Pullen transported K.J. to the hospital and while she waited there, she was contacted by the middle-school resource officer, who indicated that L.B.-2 had been injured. Ms. Pullen instructed the officer to bring L.B.-2 to the hospital and to have L.B.-1, who was a high school student, checked for injuries. Ms. Pullen testified that both L.B.-1 and L.B.-2 had cerebral palsy.

When L.B.-2 arrived at the hospital, Ms. Pullen discovered linear marks on his back similar to those found on K.J., except that L.B.-2's marks seemed more severe. They were bleeding and oozing, resulting in his shirt sticking to his back. Ms. Pullen characterized the marks as "fresh" injuries.

Later L.B.-2's older brother, L.B.-1, was brought to the hospital. L.B.-1 had injuries similar to those of his brother.

Ultimately, K.J.'s siblings, S.J. and J.J., were brought to the hospital. According to Ms. Pullen, S.J. had "little round marks" on her body and large patches of bruising on her side, lower back, and around her neck. J.J. had some scars and a fresh burn in his groin area. Through Ms. Pullen, the state introduced photographs of the children's various injuries and scars.

Brownsville Police Officer Joel Parker was dispatched on December 7, 1999 to the defendants' business, Owens Clothing Store, to instruct Sarah Owens to go to AECC because of a "situation" with K.J. Ms. Owens did not noticeably react to the request and drove her own vehicle to AECC. Officer Parker followed. At AECC, Ms. Owens "never showed any expression" or "sign of emotion." Officer Parker discerned no "surprise or concern" in her demeanor.

Brownsville Police Investigator Shawn Williams was present when Sarah Owens came to AECC. He described her demeanor as "unconcerned" and testified that Ms. Owens said that "the children were always either with her or her husband or at the school or sometimes with her mother." Ms. Owens stated in Officer Williams' presence that she was unaware of any injuries to

the children. Officer Williams agreed that Mr. Owens treated the child abuse allegations as a "big joke."

As a result of the injuries to the children discovered on December 7, Assistant Police Chief Johnny Blackburn arrested defendant Johnny Owens when he came to AECC that afternoon. Accompanying Mr. Owens was M.J., a toddler, who was in a child restraint seat in Mr. Owens' car. Chief Blackburn testified that Mr. Owens denied knowing about any injuries to the children and that Mr. Owens showed little concern about the children. Mr. Owens laughed about the allegations and appeared not to take them seriously. Brownsville Police Officer Mike Smothers, who was present when Mr. Owens was arrested, agreed that Mr. Owens was relaxed and unconcerned. Officer Smothers testified that Mr. Owens showed no remorse and treated the arrest "like a big joke." The officers noticed no sign of physical abuse on M.J.

After the defendants were arrested and while they were in custody, the police obtained a warrant to search the defendants' residence. Inside the home, officers found a stick wrapped in duct tape, an electric cord wrapped in duct tape, a metal rod affixed to a wooden handle with a metal nut on the rod's end, a broken broom handle, and a rope with a handle on each end and a pulley in the middle. The metal rod and the rope with the pulley were found in the defendants' bedroom.

Officer Williams testified that some of the wounds on the children were linear, with the marks ending in an indentation. These wounds were especially discernible on L.B.-1. Officer Williams opined that these wounds were consistent with having been inflicted by the metal rod. On cross-examination, however, he admitted that the indentations at the end of linear marks were not discernible on the photographs of L.B.-1.

S.J. testified at trial (February 28 through March 2, 2001) that she was six years old.[1] She testified that she once lived with the defendants, along with K.J., J.J., M.J., L.B.-1, and L.B.-2. She testified that, on the day she went from school to the hospital, she had "[s]ome cigarette burns and some bruises." When asked how she received her injuries, she testified that "Johnny" and "Sarah" had whipped her with a wooden paddle and a cord wrapped in duct tape. She identified the tape-wrapped cord that had been retrieved from the defendants' home and that had been introduced into evidence as the appliance that the defendants had used to whip her. She testified that she was in the same room when K.J. was whipped and was in the house when "the boys" were whipped. She heard them crying and screaming. S.J. testified that she was whipped ten or twelve times and that the defendants would strip her and the other victims of their clothes before whipping them. She testified that both the defendants whipped her.

Doctor Joseph B. Pierce testified by video deposition that he was director of the hospital emergency room to which the children were brought in December 1999. Doctor Pierce examined each of the children. He testified that L.B.-1 had cerebral palsy and, although this child's

---

[1]However, medical evidence in the case established her birthday as March 3, 1993, which would make her almost eight years old.

verbal communication was limited, he gave a history of "mom beating him." He exhibited multiple scars in the scalp that were old and well healed, as well as old scars and new contusions on his chest. Some of the marks were three to five days old. L.B.-1's back had scars "too numerous to count." Some were old, but some appeared to be less than a week old. On L.B.-1's legs, Dr. Pierce found "scars on top of scars."

Doctor Pierce testified that L.B.-2 , born January 26, 1986, also had cerebral palsy. L.B -2 stated that his "mom" had beaten him. Doctor Pierce found three areas of swelling on L.B.-2's head and lacerations "too numerous to count" on his back. His buttocks had multiple wounds, and his lower left leg had two linear marks, one old and one "very new."

Doctor Pierce's examination of K.J., age seven, revealed old and new wounds on her chest and lacerations on her back that were "too numerous to count," with both old and new scar formation. Most of the lacerations appeared to be 72 hours old. She also had old and new scarring on the backs of her legs. K.J. told Dr. Pierce that both the defendants had beaten her on the previous Sunday, three or four days before the examination.

Doctor Pierce testified that S.J., who was six years old, had old scars "too numerous to count" on her back. Some appeared to be seven to ten days old. Doctor Pierce found round scars on her abdomen and back that appeared to be consistent with cigarette burns. She had scars on her legs. He found bruising that appeared to be seven to ten days old.

Doctor Pierce testified that J.J. was four years old, born July 3, 1995. J.J.'s examination revealed that he had numerous old scars on his upper chest and back. Some of the scars on his back appeared to be ten to fourteen days old. His buttocks and the backs of his thighs bore numerous scars and two welts that appeared to be seven to ten days old. Doctor Pierce found a wound lateral to the testes that appeared to be a cigarette burn. The wound was "weeping and very fresh."

Doctor Pierce examined M.J., who was two years old and was the youngest of the children. He found no indication that M.J. had been beaten or injured.

Doctor Pierce testified that he saw injuries on all the children except M.J. which were consistent with injuries that could result from use of the tape-wrapped electric cord and the metal rod. He opined that the rope with the pulley was an

> instrument that is used to basically take a child's hands and wrap them in such a way that they can[] be . . . restrained and then they are usually pulled up either on an instrument such as . . . a door so that they can be extended in a complete fashion so that they can be better beaten and also unable to fight back.

When asked whether the injuries that he found on five of the children would have caused "extreme pain," Dr. Pierce responded, "Absolutely." Doctor Pierce further opined that the five children who bore scars and bruises had been systematically beaten over a period of several months. He testified that, despite having seen "several hundred" cases of child abuse, the victims' injuries represented the worst child abuse he had ever seen.

On cross-examination, Dr. Pierce testified that none of the victims had any broken bones, and he noticed no marks on any of the victims' hands.

In her defense, Sarah Owens called as witnesses some of her relatives and other long-standing acquaintances. These witnesses testified generally that they visited regularly in the Owens residence, knew the victims, and observed that both the victims and Ms. Owens behaved in a normal fashion. The victims appeared to be happy and did not appear to be afraid of either of the defendants. Some of the witnesses opined that Ms. Owens loved the children. Ms. Owens' brother testified that the victims minded Ms. Owens well and that she "had them under control." Ms. Owens' sister-in-law opined that the victims were "crazy about" Ms. Owens. Ms. Owens' sister, who had spent the weekends in the Owens house, testified that the children played well together and reacted to Ms. Owens "like a mother."

Sarah Owens testified that, in 1993, she and Johnny Owens completed foster parent preparation classes sanctioned by the Department of Children's Services. In the classes, they learned how to discipline foster children by using "time out." She testified, "We don't whip. That was the no. 1 priority that we went through in the training. The Department told us not to whip any of the children. We weren't to whip them no matter what they did."

Ms. Owens testified that she and her husband received L.B.-1 and L.B.-2 into their house on June 5, 1995. The boys already had scars, and L.B.-2 had a print left by a clothes iron. The Owens received S.J. in August 1996 and ultimately adopted her. They received J.J., M.J., and K.J. in May 1998. J.J. and K.J. had marks on them when they came to the Owens.

Ms. Owens testified that L.B.-1 would bite himself when he became frustrated and would bite and hit his brother, L.B.-2. Referring to photographs that had been placed in evidence, Ms. Owens testified that all of the marks on L.B.-1 were there when he came to the Owens, except for marks on his hip which he had received when he accidentally fell into the air conditioning vent after Ms. Owens had removed the cover to service the system. She testified that L.B.-1 had also been scratched while playing in a pile of leaves and sticks around Thanksgiving 1999.

Ms. Owens denied knowing anything about the broom handle or the tape-wrapped cord. She denied using either instrument to discipline the victims and denied seeing anyone else use them. She identified the rope-pulley device as an exercise-therapy device that was medically prescribed for her use following a car accident that had temporarily and partially paralyzed her. She testified that she used the device twice a day to keep her "joint[s] active." She denied that she ever used the device to restrain the victims.

Ms. Owens explained that J.J. was bruised as a result of his penchant for jumping from the school bus when he was let out at home in the afternoons. After jumping from the bus, he would roll down the hill. She denied causing any of the bruises on J.J. or seeing anyone else do so.

Ms. Owens testified that she does not smoke and has never smoked. She opined that the round marks on S.J. that were identified by Dr. Pierce as cigarette burns were actually scars left from S.J.'s previous ringworm infection. Ms. Owens testified that she had S.J. treated for the infection. Ms. Owens also took S.J. to the doctor twice a year to monitor her heart murmur.

Ms. Owens testified that both S.J. and K.J. had marks on them when they came to the Owens house. Ms. Owens admitted that K.J. suffered a burn on her back on Thanksgiving Day 1999 when Ms. Owens, who was attending to K.J.'s hair, accidentally dropped a hot curling iron down K.J.'s back, inside her robe.

On cross-examination, Ms. Owens again denied that she had ever seen the tape-wrapped cord and opined that the police had planted it in her house during the execution of the search warrant, which was carried out while the Owens were in jail. Ms. Owens testified that the school principal was lying when she said that she asked Ms. Owens how K.J. had received her injuries and that S.J. was lying when she said that Ms. Owens stripped her and whipped her.

Defendant Johnny Owens called as a witness Dr. Gerald White, an experienced physician who had treated the victims in the past. He treated S.J. for bronchitis and noted a heart murmur that was probably congenital. In all, he saw S.J. 34 or 35 times and observed no injuries or any other indicia of child abuse. On May 28, 1999, Dr. White treated L.B.-2 for bronchitis and saw no scars or other indicia of child abuse. L.B.-2 had regular and normal visits to Dr. White's office. L.B.-1 was seen in Dr. White's office over a span of four years and was last seen in April 1999. Doctor White saw no bruises or other indicia of abuse. Doctor White also saw J.J., the last time on September 20, 1999. His notes reflected no evidence of abuse. On July 1, 1999, Dr. White performed a school physical examination on K.J. He found no marks or other indicia of child abuse.

Johnny Owens testified that he was 70 years of age and had been married to Sarah Owens for eight years. He and Sarah Owens underwent twelve weeks of training to become certified foster parents. He testified that S.J., K.J., M.J., and J.J. were "blood kin" to him. He testified that he typically went to work at 3:30 p.m., before the victims came home from school, and that they would be asleep when he returned from work. He testified, "I didn't have anything to do with the children." He testified he had never seen his wife whip the children.

He identified the metal rod as the handle of a broken camp skillet. The Owens hung it behind their bedroom door to keep it away from the children. The rope-pulley device was only used by Ms. Owens to perform her exercises. Mr. Owens testified that, after his wife had been summoned to AECC on December 7, he went home. He did not dispose of any items before the police searched the home.

Mr. Owens testified, "I never hit none of those kids in that house." He denied making any marks on any of the victims and denied burning any of them with cigarettes. Although he claimed that he and his wife did not allow smoking inside the house, he admitted that he smokes. He denied seeing anyone abuse the victims.

On cross-examination, the state asked Mr. Owens "about how there've been eight referrals of you and your wife since the 20th of May of 1996 for abusing children?" Mr. Owens replied that the referrals related to other foster children, not the victims in the instant case. Mr. Owens confirmed that, in response to the referrals, the Owens' foster care privileges were suspended until they attended parenting classes. He added, "We went to see the nut doctor, too." Mr. Owens characterized the requirements of classes and counseling as the Department of Children's Services' overreaction to a Department representative erroneously believing that a foster child in the Owens' care had "switch" marks. Mr. Owens attributed the overreaction to an unrelated, publicized incident involving a "dumpster baby."

After hearing the evidence, the jury convicted Sarah Owens of five separate counts of aggravated child abuse, one count for each of the victims, L.B.-1, L.B.-2, J.J., S.J., and K.J. The jury acquitted her on the count alleging aggravated child abuse of M.J. The trial court imposed eight-year, Class B felony, Department of Correction sentences on all counts, except for the count involving J.J., on which it imposed a twenty-year, Class A sentence in the Department of Correction.[2] Two eight-year sentences run consecutively to the twenty-year sentence, and the other sentences run concurrently to the twenty-year sentence, yielding an effective incarcerative sentence of 36 years.

The jury convicted Johnny Owens only of the aggravated child abuse of S.J. The trial court imposed an incarcerative sentence of eight years in the Department of Correction.

## I. Sufficiency of the Evidence.

Both defendants challenge the sufficiency of the convicting evidence and the failure of the trial judge to grant a judgment of acquittal. We group these two appellate claims together because we apply the same standard in reviewing both the denial of a judgment of acquittal and the sufficiency of the convicting evidence. *See State v. Price*, 46 S.W.3d 785, 818 (Tenn. Crim. App. 2000), *perm. app. denied* (Tenn. 2001).

A criminal conviction may be set aside only when the appellate court finds that the "evidence is insufficient to support the finding by the trier of fact beyond a reasonable doubt." Tenn. R. App. P. 13(e). "A jury verdict, approved by the trial court, accredits the testimony of the witnesses for the state and resolves all conflicts in favor of the state's theory." *Price,* 46 S.W.3d at

---

[2]The judgment for count four in which the twenty-year sentence was imposed specifies that the conviction offense is a Class A felony and refers to the victim being under six years of age. *See* Tenn. Code Ann. § 39-15-402(b) (1997).

818; *see State v. Hatchett*, 560 S.W.2d 627, 630 (Tenn. 1978). Following the conviction, the appellate court reviews the evidence in the light most favorable to the state and affords the state the benefit of all inferences that may be reasonably drawn from the evidence. *State v. Cabbage*, 571 S.W.2d 832, 836 (Tenn. 1978). This means that issues of the credibility of witnesses and the weight to be ascribed to their testimony are matters entrusted to the trier of fact and are not issues for appellate analysis. *Price*, 46 S.W.3d at 785.

It is well established that a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the state and resolves all conflicts in favor of the theory of the state. *Hatchett*, 560 S.W.2d at 630; *State v. Townsend*, 525 S.W.2d 842, 843 (Tenn. 1975). On appeal, the state is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. *Cabbage*, 571 S.W.2d at 836.

Moreover, a verdict against the defendant removes the presumption of innocence and raises a presumption of guilt on appeal, *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973); *Anglin v. State*, 553 S.W.2d 616, 620 (Tenn. Crim. App. 1977), which the defendant has the burden of overcoming, *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

Most significantly, when the sufficiency of the evidence is challenged, the relevant question for an appellate court is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13*; Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 2782 (1979); *see also State v. Williams*, 657 S.W.2d 405 (Tenn. 1983). This rule applies to findings based on both direct and circumstantial evidence. *State v. Thomas*, 755 S.W.2d 838, 842 (Tenn. Crim. App. 1988). Circumstantial evidence alone may be sufficient to convict one of a crime. *State v. Boling*, 840 S.W.2d 944, 947 (Tenn. Crim. App. 1992).

As charged in the indictments in the present case, aggravated child abuse is committed by one who, "other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury," and "the act of abuse . . . results in serious bodily injury to the child." Tenn. Code Ann. §§ 39-15-401(a) (1997) (proscription and definition of child abuse), -402(a) (1997) (proscription and definition of aggravated child abuse). Aggravated child abuse pursuant to Code section 39-15-401(a) is a Class B felony, "provided, that, if the abused . . . child is six (6) years of age or less, the penalty is a Class A felony." *Id.* § 39-15-402(b) (1997). Our Code defines "serious bodily injury" as "bodily injury which involves: (A) A substantial risk of death; (B) Protracted unconsciousness; (C) Extreme physical pain; (D) Protracted or obvious disfigurement; or (E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty." *Id.* § 39-11-106(a)(34) (1997).

Essentially, the defendants support their arguments that the evidence is insufficient by pointing to their own testimony that they did not whip or otherwise abuse the victims, to expert testimony that conflicted with the state's expert, and to circumstances which, they maintain, support inferences of an exculpative nature. For purposes of our review, we analyze the sufficiency of the

evidence supporting the Class B felony convictions of both defendants separately from Sarah Owens' Class A felony conviction on count four.

The evidence presented to the jury in this case illustrates that L.B.-1, L.B.-2, S.J., and K.J. received serious bodily injuries in the form of extremely painful physical injuries. These injuries were the result of beatings administered by one or both of the defendants, as found by the jury. With respect to these victims, the elements of aggravated child abuse were established by the evidence.

We note that the jury, not the appellate court, has the prerogative of choosing those witnesses to believe and of determining the weight to be assigned to their testimony. The jury, not the appellate court, has the prerogative of drawing inferences from the evidence. As an appellate court, we merely look at the evidence in the light most favorable to the state, indulging the state the benefit of all reasonable inferences, to determine whether any reasonable jury could have found the defendants guilty beyond a reasonable doubt. After making this examination as to the Class B felonies, we conclude that the evidence is sufficient with respect to both defendants to support the respective convictions.

We now review Sarah Owens' Class A felony conviction on count four, which alleged her aggravated child abuse of J.J. The record contains no direct evidence that Sarah Owens actively abused J.J. S.J. testified that both defendants whipped her and that she witnessed them whipping K.J. Also, K.J. gave Dr. Pierce a medical history that included her statement that, on the Sunday before the medical examination, both defendants had beaten her. Additionally, both L.B.-1 and L.B.-2 gave Doctor Pierce medical histories that reflected that their "mom" had beaten them.[3] J.J. provided the doctor with no medical history about the origin of his injuries. The proof, however, showed that, although S.J. had not seen the "boys" being whipped, she had been in the house when she heard them crying and screaming. She explained that the "boys" included J.J., and she heard Sarah Owens order the boys to remove their clothes prior to the whipping. Doctor Pierce testified that the marks on all five injured children were similar and were consistent with the instrumentalities seized from the Owens house. Although the evidence on count four is weaker than that on the other counts, it does establish beyond a reasonable doubt that Sarah Owens committed the aggravated abuse of J.J.

Thus, the convictions on all counts and for both defendants are supported by sufficient evidence.

## II. Remaining Issues.

Both parties raise additional issues, whether

---

[3]Evidence in the record shows that at least S.J. and L.B.-1 referred to Sarah Owens as "momma."

A. The trial court erred in allowing the state to examine Sarah Owens about her income;

B. The trial court erred in allowing the state to question Johnny Owens about prior allegations of the defendants' abuse of children who were not the subject of the instant prosecutions;

C. The trial court erred in failing to instruct the jury on the "missing witness" rule; and

D. The defendants were denied a fair trial because of cumulative errors.

In addition to these issues, Sarah Owens complains that

E. The trial court erred in causing Sarah Owens to abandon her request to sequester the jury; and

F. Her sentence is excessive.

We will consider in turn these issues raised by defendant Sarah Owens, but we are constrained to treat as waived the appellate issues raised by defendant Johnny Owens. His motion for new trial raised only evidence sufficiency issues and did not contain any of the other issues listed above. It is well settled that, following a jury trial, evidentiary issues and other "ground[s] upon which a new trial is sought" are waived unless they are "specifically stated in a motion for a new trial." Tenn. R. App. P. 3(e). Because Johnny Owens has failed to include any of the issues except sufficiency of the evidence in his motion for new trial, we will not review them in his appeal.[4] We now address the additional issues raised by defendant Sarah Owens.

A. Admission of Evidence of Sarah Owens' Income.

The defendant Sarah Owens claims that the trial court erred in allowing the state to cross-examine her about her income derived from providing foster care services. The defendant's bases for excluding the evidence are Tennessee Rules of Evidence 401 and 402. *See* Tenn. R. Evid.

---

[4]The record contains an order overruling the motion for new trial. The order is styled "State of Tennessee v. Sarah Owens." The record contains no corresponding written order overruling *per se* Johnny Owens' motion for new trial; however, the transcript of the hearing on his motion for new trial clearly reflects that the trial court overruled his motion. In this situation, we will deem the single written order overruling the motion for new trial as embracing the motions for new trial filed by both defendants, thus affording this court jurisdiction to hear Johnny Owens' appeal. *See* Tenn. R. App. P. 4(b). However, in the case of multiple defendants tried jointly, the better practice is for the trial court to enter a separate order for each defendant, or alternatively, one order captioned such that it clearly encompasses all defendants and addresses all issues raised by all defendants.

-10-

401 (defining relevant evidence as "evidence having any tendency to make the existence of any [material] fact more probable or less probable than it would be without the evidence"); Tenn. R. Evid. 402 (declaring that "all relevant evidence is admissible," except as otherwise mandated by the state or federal constitution or other controlling law, and that irrelevant evidence is not admissible). Essentially, she argues that the evidence is not relevant, and she additionally posits, without citation to authority, that the evidence was unfairly prejudicial. *See* Tenn. R. Evid. 403 (relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury").

During the state's cross-examination of Ms. Owens, the following exchange occurred:

Q       Mrs. Owens, you didn't just take care of these foster children out of the goodness of your heart, did you, ma'am?

A       Yes. I did.

Q       Oh, you did. You didn't receive anything from the State of Tennessee?

[Ms. Owens' counsel]: I'm objecting, Your Honor. . . . Irrelevant.

The Court: And what would be relevant?

[The prosecutor]: Your Honor, in Counsel's opening statement, Counsel said that her client had to use home remedies because they didn't have much money. And the fact of the matter is, they had lots of money and –

[Ms. Owens' counsel]: Opening statement is not evidence.

The Court: I know that. I overrule the objection.

Q       Let's just get right to it, ma'am. How much money a month did you get from the State of Tennessee while you had these five children in your home?

A       I ain't even added it up.

Q       Oh, how about something like $3,300.00 a month?

A       I really couldn't –

. . . .

Q     Oh, you really couldn't.

A     I really couldn't say.

. . . .

Q     Fact of the matter is, ma'am, you . . . lived pretty high off these kids, didn't you?

A     No.

Q     No. Tell me ma'am. Just how many inches wide is that big screen TV in your house?

A     My television is 60 inches.

The decision to admit or exclude evidence lies within the sound discretion of the trial court. *State v. Edison*, 9 S.W.3d 75, 77 (Tenn. 1999); *State v. Jackson*, 52 S.W.3d 661, 669 (Tenn. Crim. App. 2001); *State v. Carroll*, 36 S.W.3d 854, 867 (Tenn. Crim. App. 1999), *perm. app. denied* (Tenn. 2000). Ms. Owens' counsel stated in her opening remarks to the jury that, although Ms. Owens regularly took the children to the doctor, "those of you who have children [know] you use home remedies. You can't afford to go to the doctor every minute [with] any kind of injury you can take care of at home." Regardless whether the defendant "opened the door" by making these remarks, we hold that the trial court was within its discretion in allowing the cross-examination because it was relevant to a material issue. Ms. Owens had presented proof that she loved the victims. The state's line of questioning strikes at Ms. Owens' altruistic motives in accepting the children into her home. Ultimately, whether her concern for the victims' welfare was genuine would make it more probable or less probable that Ms. Owens physically abused the victims. Thus, we reject Ms. Owens' claim that the line of cross-examination was irrelevant. *See* Tenn. R. Evid. 401, 402.

Finally, we conclude that the record supports a finding that the probative value of the evidence is not "substantially outweighed by the danger of unfair prejudice." *See* Tenn. R. Evid. 403.

B. Admission of Evidence of Allegations
that the Defendants Abused Children Other Than the Victims.

Over the defendants' objections, the state cross-examined Johnny Owens about eight previous allegations of child abuse that had been received by the Department of Children's Services. During the state's cross-examination of Johnny Owens, the following exchange occurred:

Q How come it is if [you never whipped the children], sir, that there had been eight referrals to the Department of Children's Services –

[Ms. Owens' counsel]: I'm going to object, Your Honor.

[The prosecutor]: And could we be graced with the reason for this objection, Your Honor?

[Court excuses the jury.]

[The prosecutor]: My question is, could he explain why there have been eight referrals of himself and Sarah for inappropriate discipline *on the five children that were seen at the hospital* and have –

The Court: Prior to December 7, 1999?

[The prosecutor]: Yes, sir. . . . [T]hese people were ordered as a result of this to attend parenting classes . . . in March of 1998 for doing these things to these children.

. . . .

[Ms. Owens' counsel]: He doesn't know why anybody referred anything. There's no saying that these were all founded allegations. These are alleged past acts where DCS may have gotten a call in from somebody. [T]here is no probative value on this case.

[Mr. Owens' counsel]: I concur.

The Court: All right. Now, everybody in this courtroom's heard about the loving attention they gave to *these children*. They would never whip them. . . . [N]obody's ever touched those children. . . . [T]he state has evidence . . . to impeach hi[s] credibility; that [the state] has legitimate complaints by the Department of [Children's] Services where he or his wife may have mistreated *these children* before December 7, 1999?

[The prosecutor]: Yes, Your Honor.

The Court: Okay, you have evidence to that extent?

[The prosecutor]: In my hand, Your Honor.

. . . .

The Court:  – evidence that they may have been referred on past disciplinary problems of *the children*, the jury is entitled to hear it.  So, I'll overrule the objection.  . . .  You're welcome to see it.

[Counsel for both defendants review the state's documents, which are not made exhibits.  The jury returns, and the cross-examination of Mr. Owens continues.]

Q      Do you want to explain about how there've been eight referrals of you and your wife since the 20th day of May of 1996 for abusing children?

A      I can't explain, but it wasn't from abusing those children.


. . . .

Q      Who is B[] Jackson?

A      That was some kids we had before them.

Q      That's one of the ones you abused back then, wasn't it?

A      Oh, no.  No. We –

Q      Oh, no.  It wasn't him.  How about J[] Jackson? Was he one of the ones you abused?

A      No.  I never –

[Mr. Owens' counsel]: I object to . . . the line of questioning as being argumentative.

The Court: [A]sk specific questions and give Mr. Owens an opportunity to answer them . . . .

-14-

Q       When B[] Jackson . . . had switch marks on his back, how did
        you manage to explain that one away?

A       He didn't have 'em on there by me.

Q       Okay, so if the reports of the CPS [sic] say that he had
        switch marks on his back, that's another lie in this
        massive conspiracy against you.

A       Evidently it was . . . .

(Emphasis added.)

Initially, we note that the state's purpose in proposing the cross-examination was to impeach Mr. Owens' claims that he had not whipped the victims. It is obvious from the transcript excerpt that, during the cross-examination of Mr. Owens, the state jumped track and began to inquire about the abuse of children other than the victims in the present case. Although Ms. Owens objected to the use of the eight referrals that were described by the prosecutor as showing abuse of the victims in the present case, she did not object to the shift in questioning that elicited answers from Mr. Owens about the abuse of the Jackson children. However, in her motion for new trial and in her appellate brief, Ms. Owens complains only that the trial court erred in allowing this latter line of questioning. She relies in her appellate brief upon Tennessee Rule of Evidence 608, which provides in part:

> (a) Opinion and Reputation Evidence of Character. The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) the evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked.

> (b) Specific Instances of Conduct. Specific instances of conduct of a witness for the purpose of attacking or supporting the witness's credibility, other than convictions of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, if probative of truthfulness or untruthfulness and under the following conditions, be inquired into on cross-examination of the witness concerning the witness's character for truthfulness or untruthfulness or concerning the character for truthfulness or untruthfulness of another witness as to which the character witness being cross-examined has testified. The conditions which must be

-15-

satisfied before allowing inquiry on cross-examination *about such conduct probative solely of truthfulness or untruthfulness* are:

> (1) The court upon request must hold a hearing outside the jury's presence and must determine that the alleged conduct has probative value and that a reasonable factual basis exists for the inquiry;
>
> . . . .
>
> (3) If the witness to be impeached is the accused in a criminal prosecution, the State must give the accused reasonable written notice of the impeaching conduct before trial, and the court upon request must determine that the conduct's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues. The court may rule on the admissibility of such proof prior to the trial but in any event shall rule prior to the testimony of the accused. If the court makes a final determination that such proof is admissible for impeachment purposes, the accused need not actually testify at the trial to later challenge the propriety of the determination.

Tenn. R. Evid. 608 (emphasis added).

Ms. Owens complains that the trial court failed to comply with the requirements of Rule 608(b)(3). We conclude, however, that the defendant's reliance upon Rule of Evidence 608 is misplaced. To be sure, the state initially offered the evidence of the child abuse referrals as a means of impeaching Johnny Owens, but the evidence relating to possible acts of child abuse is not, as such, "probative solely of truthfulness or untruthfulness," as required by Rule 608(b) as a means of using specific instances of conduct to impeach a witness. *See* Tenn. R. Evid. 608(b). In other words, the specific instances of the defendant-witness's conduct are not suggestive of credibility as would be the case had a witness, for instance, previously lied on an employment application or misrepresented a loss on an insurance proof-of-loss form. Thus, we conclude that the procedural requirements of Rule 608 were not implicated.

Rather, the true nature of the state's use of the child abuse referrals was to impeach Johnny Owens through fact contradiction, a device that is recognized by our courts. *See, e.g., State v. McKinney*, 74 S.W.3d 291, 317 (Tenn. 2002) (appendix). Through fact contradiction, a cross-examining party inquires about facts that conflict with the witness's testimony to show indirectly that the witness is untruthful. Neil P. Cohen *et al.*, Tennessee Law of Evidence § 6.07 [4][b] (4th ed. 2000). In the present case, the state proposed to use the evidence of the child abuse referrals as a means of contradicting the witness's assertions that he and his wife loved the victims and did not whip them. Obviously, based upon his comments, the trial judge accepted the state's fact-contradiction rationale for impeaching the witness.

That said, Ms. Owens on appeal does not challenge the propriety of allowing the state to cross-examine Mr. Owens about the prior allegations of abuse of the victims in the present case. Rather, she challenges only the state's cross-examination of Johnny Owens about the defendants' alleged abuse of B[] and J[] Jackson. Because the premise of the impeachment was described by the state as contradicting Mr. Owens' claim that he loved the victims and that he did not whip them, it can hardly be said that allegations that he had whipped either or both of the Jackson children contradicts the witness's claims of affinity for the victims in the present case. The upshot is that the allegations concerning the Jackson children served no impeachment purpose at all.

Thus, impeachment is not an apt basis for using the evidence of the abuse of the Jackson children. Although we agree with Ms. Owens' position that the evidence was not admissible as impeachment evidence, it behooves Ms. Owens as the opponent of the evidence and the appellant before this court to illustrate why the evidence is *otherwise inadmissible*. *See, e.g., Kim v. Boucher*, 55 S.W.3d 551, 555 (Tenn. Ct. App. 2001) (trial court has wide discretion in admitting or rejecting evidence and "will be reversed *on appeal only when there is a showing* of an abuse of discretion") (emphasis added).

In this vein, we recognize that the questions concerning the Jackson children elicit evidence of prior bad acts that tend to show the actor's propensity on a specific occasion. We know that our Rule of Evidence 404(b) generally prohibits the use of such propensity evidence. *See* Tenn. R. Evid. 404(b); *see also State v. McCary*, 922 S.W.2d 511, 514 (Tenn. 1996); *State v. Rickman*, 876 S.W.2d 824, 828 (Tenn. 1994). The problem with employing a Rule 404(b) analysis at this juncture is that neither defendant objected to the "Jackson" line of cross-examination, and Ms. Owens' earlier objection was not on the grounds of Rule 404(b). *See, e.g.,* Tenn. R. Evid. 103(a) (error may not be predicated upon an evidentiary ruling without a timely objection that specifically states the ground of objection); *State v. Korsakov*, 34 S.W.3d 534, 545 (Tenn. Crim. App. 2000) (defendant may not base an objection to the admission of evidence on one ground at trial and "then base his argument on another ground, such as the violation of Rule 404(b), Tenn. R. Evid., on appeal"). Thus, the possible error in allowing the line of cross-examination will not be noticed by this court unless it qualifies as plain error. *See* Tenn. R. Crim. P. 52(b).

We consider several factors to determine when to notice plain error:

(a) [T]he record must clearly establish what occurred in the trial court;

(b) a clear and unequivocal rule of law must have been breached;

(c) a substantial right of the accused must have been adversely affected;

(d) the accused did not waive the issue for tactical reasons; and

(e) consideration of the error is "necessary to do substantial justice."

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (approving factors set forth in *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). Our supreme court emphasizes that "all five factors must be established by the record before [the supreme court] will recognize the existence of plain error." *Id.* at 283. Moreover, "complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id.*

We conclude that we are not presented with a case in which we are compelled to notice plain error. Because Ms. Owens did not base an objection on Rule 404(b) and did not request a hearing on that basis, *see* Tenn. R. Evid. 404(b)(1), the trial court did not "determine [whether] a material issue exist[ed] other than conduct conforming with a character trait" that would have supported the use of the evidence, and if so, it did not determine whether the probative value of the evidence was outweighed by the "danger of unfair prejudice." *See* Tenn. R. Evid. 404(b)(2), (3). Moreover, not only did the state not have an opportunity to argue or show that the evidence was admissible for "other purposes" than propensity, *see* Tenn. R. Evid. 404(b), it was not called upon to address the issue in its appellate brief. Furthermore, we cannot tell whether, as a condition to admissibility, the state could have shown that "a reasonable factual basis" existed for making the inquiry about the abuse of the Jackson children. *See* Tenn. Rule Evid. 405(a)(2). The state's documents, which may have been the basis for the inquiry, were not proffered for record purposes, despite being reviewed by counsel for the defendants. Thus, we are hampered by the record's failure to clearly establish what occurred in the trial court and by the inability to discern that a clear and unequivocal rule of law was necessarily breached. *See Smith*, 24 S.W.3d at 282.

In conclusion, we find no plain error with respect to the state's cross-examination of Johnny Owens.

In her brief under the heading that the trial court committed error in admitting evidence of allegations of the abuse of the Jackson children, Ms. Owens argued that the prosecutor was guilty of misconduct in asking Mr. Owens about the Jackson children. We have not considered this issue; it was not raised in Ms. Owens' motion for new trial. *See* Tenn. R. App. P. 3(e) (providing for the waiver of certain issues not presented in a motion for new trial).

### C. The Trial Court's Failure to Instruct the Jury on the "Missing Witness" Rule.

The defendant Sarah Owens is aggrieved that the trial court, in response to her motion, declined to instruct the jury that the failure of L.B.-1, L.B.-2, K.J., and J.J. to testify at trial warranted invocation of the "missing witness" rule.

> Under the missing witness rule, a party is entitled to argue, and have the jury instructed, that if the other party has it peculiarly within his power to produce a witness whose testimony would naturally be

favorable to him, the failure to call that witness creates an adverse inference that the testimony would not favor his contentions.

*State v. Middlebrooks*, 840 S.W.2d 317, 334 (Tenn. 1992) (citation omitted). The rule does not apply unless the evidence shows that "the witness had knowledge of material facts, that a relationship exists between the witness and the party that would naturally incline the witness to favor the party and that the missing witness was available to the process of the Court for trial." *Id.* (quoting *Delk v. State*, 590 S.W.2d 435, 449 (Tenn. 1979)). The missing witness rule is predicated upon the idea that the missing witness, "if produced, would have made an intelligent statement about what was observed." *Dickey v. McCord*, 63 S.W.3d 714, 722 (Tenn. Ct. App. 2001) (quoting *State v. Francis*, 669 S.W.2d 85, 89 (Tenn. 1984)).

The requirement of unavailability of the missing witness means not only that the witness was "not within the subpoena power of the trial court," *State v. Philpott*, 882 S.W.2d 394, 407 (Tenn. Crim. App. 1994), but also that the witness "must not have been equally available to both parties." *State v. Boyd*, 867 S.W.2d 330, 337 (Tenn. Crim. App. 1992) (police officer being "under the control of the prosecution" deemed insufficient to qualify the absent officer as a missing witness in the absence of evidence (1) that the state attempted to conceal his existence, (2) that defense counsel sought to interview the officer, and (3) that the officer would have refused to be interviewed by defense counsel had he been approached).

Before the missing witness rule may be invoked, not only must the missing witness have been peculiarly available to the claiming party, but also the witness must have "peculiar knowledge of material facts." *Boyd*, 867 S.W.2d at 337; *see also State v. Eldridge*, 749 S.W.2d 756, 758 (Tenn. Crim. App. 1988). "'No [] inference arises where the only object of calling such witness would be to produce corroborative, cumulative, or possibly unnecessary evidence . . . .'" *Dickey*, 63 S.W.3d at 721 (quoting *Stevens v. Moore*, 24 Tenn. App. 61, 139 S.W.2d 710, 717 (1940)).

The burden to establish the aptness of the missing witness jury instruction lies with the claimant. *See State v. Thompson*, 768 S.W.2d 239, 250 (Tenn. 1989). Our courts have stressed that, when a claimant establishes entitlement to the missing witness jury instruction, the result is not a presumption that the missing witness would have testified favorably to the claimant; rather, a permissive inference to that effect is created. *Middlebrooks*, 840 S.W.2d at 334.

Ms. Owens moved the court to instruct the jury via Tennessee Pattern Instruction - Criminal 42.16, which provides:

When it is within the power of the state or the defendant to produce a witness who possesses peculiar knowledge concerning facts essential to that party's contentions and who is available to one side at the exclusion of the other, and the party to whom the witness is available fails to call such witness, an inference arises that the testimony of such witness would have been unfavorable to the side

that should have called or produced such witness. Whether there was
such a witness and whether such an inference has arisen is for you to
decide and if so, you are to determine what weight it shall be given.

Committee on Pattern Jury Instruction (Criminal), Tennessee Pattern Jury Instructions - Criminal
42.16 (6th ed. 2001). Although the prosecutor responded to the motion by orally informing the trial
court that the absent victims had been placed in Indiana and that the State of Indiana had refused to
honor the trial court's subpoenas to have those victims appear at trial, no evidence was introduced
to show the whereabouts of the absent victims or to corroborate the prosecutor's claim that Indiana
would not honor the trial court's subpoenas.

We perceive no error in the trial court's refusal to give Pattern Instruction 42.16. The
burden rested upon Ms. Owens to establish the threshold requirements for invoking the missing
witness rule. One of the requirements is that the missing witnesses must be available by being
subject to the service of process. *Middlebrooks*, 840 S.W.2d at 334. Ms. Owens failed to establish
the availability of the absent victims.[5] Thus, her claim of entitlement to the missing witness
instruction fails.

### D. Denial of Fair Trial Through Cumulative Error.

The defendant Sarah Owens argues that the cumulative effect of trial court errors
deprived her of a fair trial; however, we have identified no error. Therefore, we find no errors which
can be considered cumulative.

### E. Trial Court's Error in Causing Sarah Owens to Abandon Her Request to Sequester the Jury.

Prior to trial, Sarah Owens moved the trial court to sequester the trial jury. The trial
judge responded by informing Ms. Owens' counsel of his practice governing a motion to sequester
made by a defendant who is free upon bail during trial.[6] Essentially, the court told counsel that it
would grant the motion to sequester the jury only if the defendants are confined during the pendency
of the trial. The trial judge said, "Over my years of sitting on the bench jurors don't like to be

---

[5]Tennessee Code Annotated sections 40-17-201 through -212 constitute Tennessee's enactment of the Uniform
Law to Secure the Attendance of Witnesses from Within or Without a State in Criminal Proceedings. As such, the Act
specifies a hearing and fact-finding procedure to be carried out in a responding state when a court exercising criminal
jurisdiction in an initiating state seeks the attendance of a witness who is located in the responding state. *See* Tenn. Code
Ann. §§ 40-17-203, -204, -207 (1997). The evidence of record in the present case does not establish whether the absent
victims were located outside Tennessee, or if so, whether the state proceeded via Code section 40-17-207 to initiate
proceedings to effectuate summons via the Uniform Act, whether Indiana or any other responding state participates in
the Uniform Act, or if so, whether that state's procedures corresponding to Tennessee Code Annotated section 40-17-203
and -204 were pursued.

[6]The trial judge is a Senior Judge who was designated to try the case and who does not regularly sit in Haywood
County.

sequestered and watch defendants walk out of the courtroom.  It can have a devastating effect on whether or not an individual gets a fair trial." Accordingly, the trial court did not *per se* deny the motion. Following the trial judge's explanation of his practice, her counsel objected that the court's tactics were unconstitutional.  Nonetheless, Ms. Owens withdrew her motion, albeit under protest. She now raises the issue on appeal.

Sequestration of a trial jury in a criminal case has been recognized as a right of a criminal defendant.  *See State v. Furlough*, 797 S.W.2d 631, 644 (Tenn. Crim. App. 1990) ("Historically, both the state and federal constitutions required sequestration of juries."); *see also* Tenn. Const. art I, §§ 6, 8, 9; *Long v. State*, 132 Tenn. 649, 179 S.W. 315 (1915).  "[T]he purpose of the rule – to preserve a defendant's right to a fair trial and impartial jury by protecting jurors from outside influences so that the verdict will be based only upon evidence developed at trial – is perhaps more important in the modern age, considering the pervasiveness of media coverage and publicity." *State v. Bondurant*, 4 S.W.3d 662, 671 (Tenn. 1999).

This court has held that, when the defendant did not waive his right to a sequestered jury and the trial court nevertheless refused to sequester the jury, an "affirmative burden" rested upon the state to show that "no prejudice actually occurred in order to permit harmless error analysis." *Furlough*, 797 S.W.2d. at 645;  *see also Gonzales v. State*, 593 S.W.2d 288, 291 (Tenn. 1980).  In *Furlough*, the court relied upon a statute which provided for the waiver of the right:

> In all criminal prosecutions except those in which a death sentence may be rendered, the judge of the criminal court may, in his discretion, with the consent of the defendant, and with the consent of the district attorney general, permit the jurors to separate at times when they are not engaged upon the actual trial or deliberation of the case.

Tenn. Code Ann. § 40-18-116 (1990) (amended Acts 1995, ch. 43, § 1).  In 1995, however, the legislature modified this statute to read as follows:

> In all criminal prosecutions, except those in which a death sentence may be rendered, jurors *shall only be sequestered on the judge's motion or on the motion of the counsel for the defendant or the district attorney general*, which shall prohibit the jurors from separating at times when they are not engaged upon the actual trial or deliberation of the case.  The party making the motion to sequester shall be unknown to the jury.

*Id.* § 40-18-116 (1997) (emphasis added).  Although the new statute does not *per se* alter a defendant's right to have the jury sequestered, it clearly rearranges the burden of putting forward an objection.  *See Kenneth MacArthur Johnson v. State*, No. E2001-00068-CCA-R3-PC, slip op. at 15-16 (Tenn. Crim. App., Knoxville, Dec. 18, 2001) (1995 statute "reflects a right to a sequestered

jury," but right may be "waived by the defendant who fails to move for sequestration"), *perm. app. denied* (Tenn. 2002). In actuality, our court has ruled that, even under the previous statute, a defendant waives the right to sequestration when he or she fails to raise the issue "at trial when any prejudicial effect of the error could have been prevented." *State v. Tony G. Smith*, No. 01C01-9603-CR-00202, slip op. at 9 (Tenn. Crim. App., Nashville, May 16, 1997); *see also Jones v. State*, 915 S.W.2d 1, 2 (Tenn. Crim. App. 1995).

With these principles in mind, we turn to the issue at hand. Clearly, Ms. Owens moved the trial court to sequester the jury. After the trial judge informed her of his "practice," Ms. Owens, through her counsel, abandoned the motion to sequester, and the trial court did not deny the motion.[7] Thus, in the absence of a motion that would trigger Code section 40-18-116, the sequestration issue was waived. *See State v. Milton Lee Cooper*, No. 03C01-9706-CR-00202, slip op. at 7-8 (Tenn. Crim. App., Knoxville, Sept. 9, 1998) (commenting that defendant who initially consented to no sequestration had burden to show prejudice), *perm. app. denied* (Tenn. 1999).

Ms. Owens now posits that she was intimidated into abandoning her motion to sequester the jury by the trial court's threat to deprive her of one constitutional right – that of bail – unless she surrendered another constitutional right – the right to be tried by a sequestered jury. Essentially, she argues that she should not be required to pay the penalty of waiver.

Indeed, our constitution ensures the right to bail to all criminal defendants, except those in capital cases "where the proof is evident, or the presumption great." Tenn. Const. art. I, § 15; *see also* Tenn. Code Ann. § 40-11-102 (1997). The constitutional guarantee of bail is not lost until the defendant is convicted. *State ex rel. Brown v. Newell*, 216 Tenn. 284, 290, 391 S.W.2d 667, 670 (1965); *see* Tenn. R. Crim. P. 32(d) (providing that trial courts review bail in felony cases "after the verdict of guilty has been returned").

In our view, however, Ms. Owens was afforded a remedy that allowed her to pursue and protect both constitutional interests. Our law provides that "[b]efore or after conviction . . . the defendant may obtain review of an order entered by a trial court from which an appeal lies to the Supreme Court or the Court of Criminal Appeals . . . denying, setting or altering conditions of defendant's release." Tenn. R. App. 8(a); *see also* Tenn. Code Ann. § 40-11-144(a) (1997). The review "may be had at any time before an appeal of [the] conviction by filing a motion for review" in the appropriate appellate court. Tenn. R. App. P. 8(a). Rule 8's purpose is to ensure "the expeditious review of release orders." *Id.,* Advisory Comm'n Comments. Not only is Rule 8 designed to expedite review of release orders, but our supreme court has said that it also is the "only *effective* remedy" for addressing unsatisfactory release orders, and an "appeal of [the bail] issue [after conviction was] of no practical effect or benefit to the defendant." *State v. Melson,* 638 S.W.2d 342, 358 (Tenn. 1982) (emphasis in original).

---

[7]Ms. Owens admits in her brief that she withdrew the motion to sequester.

We note that Ms. Owens initially presented her motion to the court, and the trial judge first explained his "practice," a week before the commencement of trial. She had an ample opportunity not only to exercise her rights pursuant to Rule 8, but also to do so before any confinement orders would have been effective.

Thus, Ms. Owens could have secured her right to a sequestered jury by prosecuting her motion. If indeed she could have demonstrated a right to pre-verdict release upon a Rule 8 review, despite winning a sequestered jury, she could have also secured the right to pre-verdict release by prosecuting her motion and pursuing a Rule 8 review of any confinement order. By withdrawing the motion to sequester and foreclosing the trial court's ruling on the motion, Ms. Owens forfeited the opportunity to secure sequestration of the jury and to obtain an order denying or altering the conditions of her pre-verdict release, which she could (and should) have appealed pursuant to Rule 8. As it is, we can neither review a denial of jury sequestration, which never occurred, nor can we effectively review the denial or modification of conditions of pre-verdict release, which also never occurred. *See State v. Rogers*, 703 S.W.2d 166, 169 (Tenn. Crim. App. 1985) (appellate court will not "pass on [issues] when there is no justiciable controversy presented").

Therefore, under the circumstances, we are unpersuaded that Ms. Owens should be excused from her waiver of the sequestration issue. We hold that her failure to pursue the sequestration motion and a Rule 8 review, if such had been necessary, forecloses our review at this juncture.

## F.  Excessive Sentence.

In her final issue, Ms. Owens complains that the sentences she received were too lengthy.

When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a *de novo* review of the record with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d) (1997). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). "The burden of showing that the sentence is improper is upon the appellant." *Id.* In the event the record fails to demonstrate the required consideration by the trial court, review of the sentence is purely *de novo*. *Id.* If appellate review reflects the trial court properly considered all relevant factors and its findings of fact are adequately supported by the record, this court must affirm the sentence, "even if we would have preferred a different result." *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

In making its sentencing determination, the trial court, at the conclusion of the sentencing hearing, determines the range of sentence and then determines the specific sentence and the propriety of sentencing alternatives by considering (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments

as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the enhancement and mitigating factors; (6) any statements the defendant wishes to make in the defendant's behalf about sentencing; and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. § 40-35-210(a), (b) (1997); *id.* § 40-35-103(5)(1997); *State v. Holland*, 860 S.W.2d 53, 60 (Tenn. Crim. App. 1993).

Ms. Owens received a sentence of twenty years for the Class A felony of aggravated child abuse of J.J. This sentence is at the midpoint of the sentencing range for Range I offenders. *See* Tenn. Code Ann. § 40-35-112(a)(1) (1997) (establishing range of fifteen to 25 years for Range I). She received a sentence of eight years for each of the other four convictions, all Class B felonies. This is the minimum sentence within the sentencing range for Range I offenders. *See id.* § 40-35-112(a)(2) (establishing range of eight to twelve years for Range I offenders). The sentences imposed were the presumptive sentences in the applicable ranges, when there are no enhancement or mitigating factors. *See id.* § 40-35-210(c) (1997).

Ms. Owens does not argue in her brief that any mitigating factors were applicable. *See* Tenn. Code Ann. § 40-35-113 (1997). The trial court applied none and applied no enhancement factors.[8] Therefore, the defendant has demonstrated no basis for modifying the trial court's imposition of the presumptive sentences.

Because Ms. Owens has failed to demonstrate the impropriety of the length of the sentences and has made no other challenge to her sentences, we decline to shorten her sentences.

The defendant has not claimed on appeal that the consecutive alignment of the sentences was erroneous; however, in keeping with our charge to review sentences *de novo*, we have looked at the imposition of consecutive sentences. *See* Tenn. Code Ann. § 40-35-401(d) (1997). Consecutive service of multiple sentences must be predicated upon the defendant falling within one of the rubrics set forth in Tennessee Code Annotated section 40-35-115(b). *See State v. Scott M. Craig*, No. E2001-01528-CCA-R3-CD, slip op. at 12 (Tenn. Crim. App., Knoxville, Aug. 27, 2002 (trial court's observation that "if all of this had to run concurrently, then there would be no punishment for kidnapping" did not supply a statutory basis for consecutive sentencing, leaving the consecutive sentencing order unsupported in the trial court's findings). Generally, these rubrics are that the defendant is a professional criminal, an experienced criminal, a dangerous mentally abnormal person, a dangerous offender, a sexual abuser of minors, a person who offends while on probation, or a person convicted of criminal contempt. *See* § 40-35-115(b)(1)- (7) (1997).

In ruling on the alignment of the multiple sentences, the trial judge said:

---

[8]It appears that some enhancement factors may have been applicable. *See, e.g.,* Tenn. Code Ann. § 40-35-114(2) (leader in the commission of the offense), (4) (particular vulnerability (of cerebral palsy) victims (L.B.-1 and L.B.-2)), (5) (exceptional cruelty), (15) (abuse of position of public or private trust).

Now, it developed during the course of the trial that the children whose age[s] run from about maybe fifteen down to a matter of months were severely abused. There was [sic] many, many evidences of scarring of the children as evidenced by the doctor, so, I do think that it would call for some consecutive sentence, so, therefore, it's my best judgment that these are horrendous offenses; they are shocking, reprehensible. The treatment of these children based under your total care as a foster parent, I think it calls out for consecutive sentences, so, it's the judgment of the Court that I'm going to run counts Two and Six consecutively to the minimum sentence of twenty years, which calls for a total sentence of thirty six years.

These remarks are devoid of any reference to Code section 40-35-115, and moreover, the remarks are not readily linked to any of section 40-35-115(b)'s predicates for consecutive sentencing. Accordingly, we look at the consecutive sentencing order *de novo* unaccompanied by a presumption of correctness. *See State v. Lane*, 3 S.W.3d 456, 460 (Tenn. 1999) (rejecting the presumption of correctness on the issue of consecutive sentencing); *Ashby*, 823 S.W.2d at 169.

Simply put, we find no predicate in Code section 40-35-115(b) which supports consecutive service of sentences in the present case. Sarah Owens was a 47-year-old woman who had no prior criminal record. She is categorically excluded from consecutive sentencing through any of the rubrics of subsection (b)(1) through (b)(7), except that she is ostensibly eligible for consecutive sentencing as a "dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." *See* Tenn. Code Ann. § 40-35-115(b)(4) (1997). To utilize a dangerous offender predicate for consecutive sentencing, however, the trial court must not only find that the elements of that predicate are present, but it must also find that consecutive sentencing "reasonably relate[s] to the severity of the offenses" and is necessary to protect society "from further . . . aggravated criminal conduct." *State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn. 1995).

The dictates of *Wilkerson* cannot be met in this case. Even if we were able to find that the defendant's deplorable conduct involved a lack of regard or hesitation about committing a crime in which the risk to human life is high, we cannot determine that a sentence extended to thirty-six years is necessary to protect the public from further offenses by this defendant.[9]

Therefore, we modify Sarah Owens' sentences by imposing them to run concurrently, an alignment that yields an effective sentence of twenty years.

---

[9] By reason of the convictions in this case being of aggravated child abuse, any aggregate sentence in this case must be actually served at a minimum of 85 percent pursuant to Code section 40-35-501(h). Tenn. Code Ann. § 40-35-501(h) (Supp. 2001).

### III.  Conclusion.

We affirm all convictions for both defendants and affirm Sarah Owens' sentences, as modified.

_____
JAMES CURWOOD WITT, JR., JUDGE